Irving B. KAHN and Peter G. Levathes, Plaintiffs,

v.

Abraham MASSLER, James Wilson, Glassy Finish Process Company and Bestway Products, Inc., Defendants.

Civ. A. No. 873-49.

United States District Court
D. New Jersey.

March 22, 1956.

As Amended April 23, 1956.

Thomas J. Brogan, Jersey City, N. J., for plaintiffs. Joseph Zorn, New York City, Charles C. Kieffer, Washington, D. C., of counsel.

Shanley & Fisher, by Frederick B. Lacey and Frank L. Bate, Newark, N. J., for defendants.

MODARELLI, District Judge.

This action was removed to this court from the Superior Court of New Jersey. The plaintiffs, Irving Kahn and Peter Levathes, are citizens and residents of New York; there are two individual and two corporate defendants: Abraham Massler, James Wilson,[1] Glassy Finish Process Co., and Bestway Products, Inc., New Jersey corporations.

In their amended complaint, plaintiffs allege that on and before December 19, 1946, Massler and Wilson were engaged in a technical capacity in the manufacture of phonograph records by conventional compression or lamination methods, or both.[2] In December, 1946, plaintiffs jointly conceived a " * * * new and novel idea of applying a technical engineering process known and described as 'injection molding' to the manufacture and production of miniature or undersized phonograph records, that is to say, phonograph records of less than the standard ten and twelve inch sizes;"

---

1. The amended complaint does not allege their citizenship, but in their amended answer, Massler and Wilson state they reside in New Jersey.

2. The entire narrative of the pleadings is based on the allegations of the amended complaint and amended answer.

that process theretofore had not been successfully applied to the manufacture of phonograph records, nor had miniature injection molded records been commercially exploited. In February or March, 1947, plaintiffs confidentially disclosed to Massler and Wilson a plan and idea supporting the process. At that time plaintiffs also " * * * engaged and retained their services, for a valuable consideration, for the purpose of, and jointly with plaintiffs, designing or causing to be designed necessary tools and dies, and developing the necessary processes for the mass manufacture and production of miniature phonograph records, manufactured by the process of injection molding." Massler and Wilson joined with plaintiffs in an effort to develop the processes to manufacture undersized phonograph records by injection molding. Plaintiffs paid the expenses of the operation, engaged in research with defendants, secured musical talent, literary and musical rights, and actively promoted the development and distribution of undersized injection molded records. "The relation created was one of mutual trust and confidence among contributors to a joint venture * * *."

In April, 1947, Massler informed plaintiffs that he and Wilson on behalf of plaintiffs had perfected the process; thereafter, equipment, including tools and dies, for use in the process was acquired at plaintiffs' expense and placed in the possession of Massler. In July or August, 1947, it was agreed among plaintiffs and Milton Brown and Jack Weiss, and defendants, Massler and Wilson, that plaintiffs would license to Brown and Weiss the exclusive right to use the process and to sell throughout the world undersized injection molded records. It was also agreed that on August 22, 1947, Massler using the aforementioned equipment and facilities of Bestway or Glassy Finish would manufacture the records on behalf of plaintiffs and their licensees, Brown and Weiss. With the full knowl-

edge and acquiescence of Massler and Wilson, plaintiffs and Brown and Weiss entered into a license contract.[3] Pursuant to the contract, Massler was paid by the licensees on behalf of themselves and plaintiffs further sums for the development of the equipment used in the process. In August and September, 1947, the licensees, acting on behalf of themselves and plaintiffs, contacted various persons, firms, and corporations for the purpose of marketing the records; one of the contacts was Simon and Schuster, Inc., a New York corporation. During the negotiations with Simon and Schuster, Massler was introduced to the officials of that firm as the person who would be responsible for and who would manufacture the records.

Massler, acting individually and on behalf of Wilson, Glassy Finish, and Bestway for the purpose of defrauding plaintiffs of the profits of their ideas, represented to Simon and Schuster that he and Wilson, or the defendant-corporations were the owners of the process. Massler, Wilson, and Simon and Schuster having conspired to defraud plaintiffs caused a cancellation of the sales contracts for undersized phonograph records held by Brown and caused Brown to convey his interests in the records known as "Golden Records" to Simon and Schuster; also, Massler and Wilson undertook to manufacture undersized records for Simon and Schuster for a consideration not known to plaintiffs, and Massler and Wilson profited and continue to profit thereby. Defendants' manufacture and sale of the undersized phonograph records manufactured by the injection molded process is a breach of the confidence and trust reposed in them by the plaintiffs during the time they entered in the joint venture, and was in fraud of the rights of ownership of plaintiffs.

Plaintiffs demand that (1) they be declared the sole owners of the process and equipment whereby defendants are manufacturing the records; (2) defendants

3. It is alleged in the amended complaint that a copy of the contract is annexed and marked Exhibit A. The amended complaint, however, does not contain the Exhibit, although it is attached to the original complaint filed in the state court.

be enjoined from disclosing the process and from disposing of the equipment; (3) defendants account to plaintiffs for all profits derived or to be derived from the manufacture and sale of the records, and for any profits derived from the defendants' use or disposition of the injection molding process; (4) defendants be ordered to turn over to plaintiffs any equipment used in the process and paid for by plaintiffs; (5) plaintiffs receive exemplary damages for defendants' wilful violation of plaintiffs' rights; (6) plaintiffs' rights and interests be declared to be held in trust by defendants for the use and benefit of plaintiffs.

Defendants deny the essential allegations of the complaint; they admit, however, Bestway was reimbursed for its cost of having caused to be manufactured one 30-cavity 2½ inch record mold by checks of Miniature Recording Company and plaintiff Levathes. Defendants also admit Massler informed plaintiffs that Bestway and Wilson could produce records by means of injection molding; Bestway was paid money through the agency of Milton Brown, Gimmicks, Inc., and Massler for designing and causing to be manufactured a 4-cavity 6-inch mold for the production of 6-inch records by means of injection molding; Bestway contracted with Simon and Schuster for the manufacture of 6-inch records.

As separate defenses, defendants allege there was no secret process in which plaintiffs had any exclusive property rights, alone or in conjunction with defendants; any know-how was the property of Bestway exclusively or with Wilson; there was never any relation of trust and confidence between plaintiffs and defendants; under any agreement, defendants were entitled to all manufacturing profits; on April 11, 1947, and for some time prior thereto, Massler had demonstrated to plaintiffs that miniature records could be produced by injection molding. Plaintiffs, Massler, and others were issued shares of stock in Miniature Recording Corporation formed for the purpose of exploiting the records. Thereafter, Massler agreed to surrender his shares of stock in the corporation and he did with the consent of the plaintiffs terminate all relations with them for any joint enterprise for the promotion of the records. No person had any authority to bind Wilson or Bestway regarding the facts alleged in the complaint. There was never any relation of trust and confidence between Brown and Weiss and defendants, and all relations among them ended on or before March 30, 1948, or May 30, 1948. Any alleged contract between plaintiffs or their licensees and Massler is void and unenforceable in that it lacks consideration, is indefinite, oral, and in restraint of trade. Plaintiffs are barred by the statute of limitations regarding tortious interference with their business or contractual relation. Defendants were never under any legal disability to deal with Simon and Schuster.

After plaintiffs completed the presentation of their evidence, defendants moved under Rule 41(b), 28 U.S.C., for a dismissal on the ground that upon the facts and the law the plaintiffs have shown no right to relief. The rule provides that "In an action tried by the court without a jury the court, as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. * * *" This action was tried by the court without a jury.

The first issue is whether on a motion under Rule 41(b), the facts and all inferences based thereon must be viewed in the light most favorable to the plaintiffs. The most recent pertinent pronouncement by the Court of Appeals for this Circuit is contained in Ettore v. Philco Television Broadcasting Corp., 3 Cir., 229 F.2d 481, 484: " * * * When an involuntary dismissal has taken place under Rule 41(b), F.R.C.P., all facts supplied by the stipulation or coming upon the record from any other source and all reasonable inferences therefrom must be viewed in the light most favorable to the plaintiff. * * *" And if that would be the appellate court's view of the facts, then it would be error for this court not

to view the facts in the same light. Thus, even though this court might wish to follow what appears to be the plain meaning of the Rule and to agree with the interpretation of other courts,[4] it is bound by the Third Circuit's "in the light most favorable" gloss upon the literal words of the amendment to the rule.

What does the court determine to be the facts? Viewing them in the light most favorable to the plaintiffs and applying the law, have they shown a right to relief?

### Facts

Irving Kahn was employed as an executive by Twentieth Century-Fox Film Corporation. While he was mainly connected with radio and television operations, he was also closely connected with the record industry. In November, 1946, he and one of his Fox associates, Peter Levathes, ate lunch together. Levathes was in charge of television and short subjects. He showed Kahn a gold charm in the shape of a record approximately 2 inches large, but which was not playable. Kahn, intrigued as to how it was possible to make a playable record of such small size, enlisted the aid of the head of a recording studio who produced some crude samples of playable 2 to 2½ inch records. Subsequently, Kahn contacted Levathes and they decided to attempt commercially to produce miniature records. In November or December, 1946, Kahn contacted Harry Lockwood, who was the head of Station WOR recording studios. The result was a sample 2½ or 3 inch vinyl record. Having learned that such small records could be manufactured, Kahn and Levathes began to work on the problem of mass production. Kahn's father, who had worked in the plastic industry, suggested the injection molding process.[5] To Kahn, " * * * it seemed like a very logical approach. So I called Pete Levathes and discussed this with him— and he knew as much about it as I did, which was virtually nothing, I mean the technical parts of how you make it—but I did start to explore where would you go to get injection molded records, or any records, made." A business acquaintance told Kahn that Alfred Manovill could do injection molding. Kahn conferred with Manovill and his associate Herbert Merin. Subsequently, Kahn, Levathes, Manovill, and Merin joined together in a group attempt to produce the records.[6] Lockwood suggested to Kahn that he contact Massler. In December, 1946, or January, 1947, pursuant to Kahn's request, Massler went to Kahn's New York office, where, with Levathes they discussed the idea. Kahn " * * * asked him [Massler] if he had any idea how he could do this, was he planning to do this by lamination or would that

---

4. See, for example, Allred v. Sasser, 7 Cir., 1948, 170 F.2d 233, 235, holding that under the Rule when the trial court is the trier of the facts, it " * * * was not bound to view it [the evidence] in a light most favorable to the plaintiff, with all attendant favorable presumptions, but was bound to take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as he believed it entitled to receive. * * *"

5. There was no novelty in the idea of manufacturing records by the process of injection molding. Kahn admitted during his testimony that the extent of the novelty and uniqueness of the idea was merely that there had never been commercially a successful injection molded record. And Levathes also conceded that the idea was not new. Eli Oberstein, who has worked in the record industry as an artist and repertoire expert since 1924, also testified that any novelty is limited to successful, commercial production. Significantly, although Kahn applied for a patent for "Miniature Phonograph Record and Stylus" in his application he did not refer to injection molding or to any method for manufacturing the records.

6. The main issue of law concerns the nature of the legal relationship among the participants. But that issue cannot be decided without first assembling the facts. Thus, throughout the narrative of the facts when the court refers to "group," what is meant is those men who were participating in the attempt to produce injection molded records not substantially greater than two inches in size.

be cheap enough or how would he do it, and did he think he would do it by injection molding or what." There was no discussion regarding what relationship Massler would have to the group. He thought he could produce the records by injection molding, which was the cheapest method; he wanted to discuss the problem with a friend. When Massler left the conference he took the "master stamper". Within about two weeks he returned to Kahn's office and produced a fistfull of 2-inch records which had been manufactured by injection molding. The samples convinced Kahn that such records could be made even though their quality was not completely satisfactory. So, Kahn asked Massler to manufacture more samples and he agreed to try different materials. They agreed that if Massler could satisfactorily produce the records at an acceptable price, he would be the manufacturer. Kahn and Levathes also agreed to pay any reasonable bills submitted by Massler, although he never submitted any bills. Massler's "friend" was Wilson, whose technical knowledge about injection molding was greater than Massler's. Although most of plaintiffs' subsequent contacts were with Massler, they knew that Wilson had the requisite technical knowledge and that he had manufactured the samples. When plaintiffs asked Massler about Wilson's relationship to the group Massler assured them that he would pay Wilson for his work.

Massler continued to produce samples. In January, 1947, Kahn, Levathes, Manovill, and Merin conferred about Massler's relationship to the group. About February 1, 1947, the quartet, still not having any definite arrangement with Massler, explored the possible bases on which he should be made a part of the group. Levathes asked Massler " * * * under what circumstances and conditions would he be willing to manufacture these records, and asked him if he would begin the calculation of cost." On March 13, 1947, Massler received a cost estimate for 500,000 circular, gummed labels. Subsequently, on March 25, 1947, Kahn and Levathes went to Charles Kieffer, an attorney, who on April 9, 1947, drafted an employment contract. In its draft form the parties to the contract are Miniature Recording Corporation and Massler; it provides that Miniature employ Massler to " * * * exercise his inventive faculties for the benefit of Miniature. * * * Miniature will pay to Massler an amount equal to ——% of the net sales of all products of Miniature and of all royalties * * *;" Miniature also was to issue to Massler thirty shares of its capital stock. The quartet offered the contract to Massler, who rejected it because he disliked working for anyone.

On April 9, 1947, Miniature Recording Corporation was incorporated under the laws of New York State. The certificate of incorporation recites the purpose of the corporation is to design, patent, manufacture, buy, and sell phonograph records, discs, and other devices in connection with the reproduction of sound; to develop methods of manufacturing and of recording; to distribute, buy, and sell records, discs, and other devices to retail dealers and at wholesale; and activities related to the recording business. The authorized number of capital shares is 200 without par value. None of the parties in this action is named as an incorporator. The first meeting of the directors was held April 11, 1947, at the New York City office of Levathes. Those present were Kahn, Levathes, Manovill, Merin, and Massler. Officers elected were Kahn, president; Levathes, executive vice-president and secretary; Manovill, vice-president; Massler, vice-president; and Merin, treasurer. The minutes of that first meeting contain a narrative of prior "* * * informal discussions among the present officers of the Corporation concerning the issuance of shares of stock to certain of such officers in consideration for labor done and property to be received for the use and lawful purposes of the Corporation." According to the minutes, Kahn stated Massler had completed the successful demonstration of injection molding of

phonograph records; Manovill had spent considerable time and effort in developing and manufacturing experimental records and had rendered services in connection with arrangements for the manufacture and development of records both by the Corporation and by others; Merin had successfully completed construction of a miniature phonograph which he had made available to the Corporation, and on behalf of it he had conducted research in connection with various devices for sound reproduction; Kahn and Levathes had been active on behalf of the Corporation in soliciting certain accounts, negotiating proposed contracts with R. C. A. Victor Recording Corporation, artists, music publishers, musicians; and Kahn and Levathes " * * * were to cause the conveyance of certain applications for patents, licenses, trade-marks, trade secrets and all rights derivative thereto and good will now owned by Dinky Disks Corporation." [7]

After discussion, a motion was passed authorizing and directing the officers to issue thirty shares of stock, respectively, to Massler, Manovill, and Merin for services rendered, fully paid, and non-assessable; fifty-one shares, respectively, to Kahn and Levathes for services rendered and because they " * * * are to cause to be conveyed to this Corporation certain properties now owned by Dinky Disks Corporation." [8]

During the two weeks following the April 11, 1947, corporate meeting, Massler's work on behalf of Miniature is evidenced by documents showing that Wilson received a cost estimate for 8-, 16- and 30- cavity injection molds; Bestway computed its cost estimate for the manufacture of "* * * 2-inch records made in vinyl to agree with samples submitted;" Bestway ordered an 8-cavity mold for a $2\frac{1}{8}$ inch diameter record. From April 23, 1947, to June 14, 1947, Miniature paid out approximately $2,000 for the mold, masters and stampers, phonograph, art work, and engineering and drafting work. The checks were signed by Massler and Merin on behalf of Miniature. During March, April, May and June, 1947, a recording company rendered services to the group, for which Miniature paid $220.65 and Kahn on Sept. 30, 1947, paid $199.12; in May and June 1947, the group ordered from another company masters, mothers and stampers, for which Kahn on October 1, 1947, paid $193; other payments by Kahn were in October and November, totaling $665 for recording artists and for the services of a patent law firm which firm had been retained by Dinky Disks Corporation and Kahn and Levathes individually. On August 22, 1947, Levathes paid $400 to the law firm, $1,000 to Manovill, Merin, and Massler, respectively, and $1,050 to Bestway. The payments to the three men were repayments of loans they had made to Miniature; the payment to Bestway was for the expansion of the eight-cavity, $2\frac{1}{8}''$ mold to thirty cavities.

In May or June, 1947, Mr. Skouras of Twentieth Century-Fox told Kahn and Levathes they were spending too much time on their outside project. After conferences among Kahn, Levathes, Manovill, Merin, and Massler, they decided to redefine their relationship to one another. Since Kahn and Levathes had to decrease the extent of their activity as members of the group, " * * * we proposed that we readjust our equities, and around about this time Massler and Wilson had gotten very active; Manovill not too active, because there wasn't much left for him to do, and Merin on the completion of the phonograph had accomplished what he set out to do. * * *." Manovill and Merin decided to withdraw from the group.[9]

---

7. Dinky Disks' certificate of incorporation was filed on March 24, 1947; plaintiffs were the owners of its stock.

8. The conveyances never were made.

9. On August 22, 1947, they surrendered for cancellation their Miniature stock certificates and they resigned as officers and directors of the corporation. Massler on the same date executed a stock surrender agreement and his resignation as officer and director.

Subsequently, on August 19, 1947, a contract was executed at Levathes' New York City office. The parties to the contract were plaintiffs, defined as "licensor," and Milton Brown and Jack Weiss, defined as "licensee." Neither licensee testified for plaintiffs. The contract recites that the licensor has information, knowledge, and know-how concerning a process for manufacturing miniature or undersized phonograph records " * * * as more fully set forth in Schedule A annexed hereto." [10] Further recitations are that the licensor owns the necessary tools and dies [11] and " * * * has communicated to LICENSEE certain ideas with respect to the manufacture, sale and distribution of said miniature phonograph records, and has already made available to LICENSEE certain models or masters of such miniature records." The licensor grants to the licensee the exclusive right to use the process, tools and dies, and to sell throughout the world miniature or undersized phonograph records. The licensor also agrees "To make available to LICENSEE all present information, knowledge and 'know-how' relating to the use of said method or process * * *" and not to use the process or tools and dies. The licensee agrees to pay the licensor, and the licensor acknowledges receipt of $10,-000.00 upon execution of the contract; and the licensee agrees to pay royalties of 50% of the net income resulting from the manufacture, distribution and sale of the records. [12] Further, the licensor warrants that it is the owner of the process, tools and dies and has the right to grant the license. The contract is to endure for ten years " * * * or shall terminate at any time by mutual consent of LICENSOR and LICENSEE."

Massler knew of the contract before it was executed. About one week or two earlier, plaintiffs and Brown went to Massler's factory, Glassy Finish Process Company, in Newark, New Jersey. It was made clear to Brown that Massler was the manufacturer, and he assured Brown that records would be delivered. At that time, the arrangement between plaintiffs and Massler was that he would continue as the manufacturer for the licensees. Plaintiffs and Massler were unable to agree upon the price at which he would manufacture, except that his price would be consistent with good business principles and a fair profit.

In the evening of the day of the execution of the license contract, plaintiffs, Massler, Brown, Weiss, and Kieffer dined at a hotel in New York City. During the dinner, Massler and the licensees decided to use a 30-cavity mold to manufacture the records; the licensors were to pay Massler for the cost of expanding the original 8-cavity mold to thirty cavities. Although Massler had not yet produced any marketable records, he had produced samples and the group very anxiously awaited the completion of the tool and die which would have made the actual production model.

During the dinner, Brown wanted to know the exact subject matter of the license contract. When there was a discussion concerning Schedule A, Levathes referred to Massler and said, " 'Here is our Schedule A.' * * * We referred to Massler all evening in that form." Schedule A was " * * * supposed to be what we had from this deal, the tools and dies that we owned, the special process we paid to have developed, and the technique as it could be put on a piece of paper as to what this special process of injection molding in records was." Despite Kahn's requests and a letter by Kieffer to Massler to produce Schedule A, he never did. He told Kahn that Wil-

10. It is not annexed. In its place is this statement: "Schedule A will accurately describe the tools and dies and method or process."

11. Again there is a reference to "Schedule A annexed hereto."

12. Initially, however, the first $5,000.00 of net income was to be paid to the licensor and the next $10,000.00 to the licensee. Also, the licensee was entitled to deductions for reasonable salaries, "reasonableness" to be determined by mutual agreement between licensor and licensee.

son's technical knowledge was needed to supply the Schedule A information, and he was unavailable.

Following the August 19, 1947, dinner at the New York City hotel, Massler frequently informed Kahn about the problems and progress concerning negotiations for a contract with Simon and Schuster, Inc. In September, 1947, Brown met Arthur Shimkin who was in charge of the Golden Record Division of Simon and Schuster; they talked about a contract for the sale of 6-inch records; Brown told him that Wilson was the expert engineer who had developed the molds for the injection molding process; Brown delivered samples produced by defendants. On October 4, 1947, Shimkin wrote to Gimmicks, Inc. (Brown) that Simon and Schuster had decided to go ahead with the Little Golden Record project. The proposed terms of a contract were set forth in the letter. Then on October 21, 1947, the contract was executed for the sale of 600,000 six-inch "Little Golden Records" at .065¢ a record, to be delivered on or before February 1, 1948. Gimmicks agrees to pay for the "complete manufacture of the records including the making of the masters, molds, mothers, labels and all other materials necessary to complete manufacture. * * * [Also] the talent, recording, scripts, music and arrangements. * * * It is further understood that you will not produce 6 inch records for the juvenile market for any other party than Simon and Schuster for as long as our orders to you in any one year total 3,000,000 records or more. This intention is based on your assurance that the maximum price of the records will not exceed .065¢ per record, in accordance with the specifications and terms herein stated." Simon and Schuster agrees to pay Gimmicks $8,750 on February 10, 1948, if Gimmicks delivers the records. "It is understood that this sum will be applied in reduction of the cost of the first 5,000,000 records ordered by us subsequent to the initial order of 600,000 records. * * * In the event that Si-mon and Schuster does not reorder beyond the first 600,000 records, Gimmicks, Inc. shall be entitled to retain this sum." Brown signed the contract on behalf of Gimmicks.

Prior to the October 21, 1947, contract, Shimkin had asked Brown to show him the manufacturing facilities. It was not until in the middle of January, 1948, however, that Shimkin visited the Bestway factory where he met defendants. Shimkin visited the factory at that time because Brown told him that soon the first record would be manufactured and Shimkin previously had expressed his desire to be present for the occasion. At the Bestway factory, there had been great difficulty in manufacturing the first records; the production delay and problems were caused by the failure to have a mold that was designed to produce 6-inch records. The large size of the mold that had been used necessitated reducing the size of the records to six inches. When Shimkin arrived at Bestway's factory, he saw a newly acquired production mold which the parties anticipated would produce about 10,000 records each day, perhaps 50,000 each week. In the ensuing two weeks, the Bestway factory produced sample records.

On January 30, 1948, Simon and Schuster paid $10,000 to Brown. The group [13] had not yet solved all of the mechanical problems relating to the successful commercial production of injection molded records.

On March 15, 1948, Shimkin wrote a memorandum to his boss at Simon and Schuster. The attempts of the members of the group to produce records finally had reached the point where they were able to test consumer demand by placing the records for sale in small stores in several communities. "However, the problems far outweigh this slight good news", wrote Shimkin; there was not a uniform satisfactory quality to the records; another problem was that they needed more than one mold to produce the records. Two days later Shimkin wrote an addition to his memorandum.

13. Brown, Massler, Wilson, and Simon and Schuster.

During the intervening two days, Brown inadvertently had seen the first page of the memorandum on which Shimkin referred to the problems. As a result, Brown offered to "wash his hands of the whole situation and when I [Shimkin]—and Bob * * * all to [sic] readily accepted this he immediately grew quite contrite and explained all the differences in costs by merely attributing them to additonal [sic] expenses." Brown insisted that Simon and Schuster pay for a second mold. As a result of the difficulties with Brown, Simon and Schuster's executives met with him. It was suggested that Simon and Schuster re-examine the possibility of dealing directly with the manufacturers, paying Brown a royalty to act as a director. "This is agreeable to Mendi [Brown] under such fantastic terms as to obviate any immediate decision. He wants one-half cent royalty on any and all Golden Records produced and sold for the next Five years * * * and offers his services as director in return. He will not allow us to deal directly with the manufacturer * * * and LS [Leon Shimkin, officer and director of Simon and Schuster] thinks it advisable to wait a few days before doing it anyway. As you know, I've been approached by the manufacturer several times—for he would like to do business directly with us." [14] Shimkin further noted in his memorandum that production was proceeding erratically; between 35,000 and 40,000 records had been produced.

14. Shimkin's testimony explains that final statement:
    " * * * Well, the reason for that is that Mendi in his previous meetings, at which my superior was present, had stated quite clearly that we couldn't do business directly with the manufacturer.
    "This was when we had discovered—and that was very early in our meetings—that he was not the manufacturer. I was informing my superior that—having discovered that Brown was totally inadequate as a manufacturer's—even a manufacturer's agent that this was not true, as he had stated, that the manufacturer would not do business with us directly.
    "In my discussions with Massler, immediately after our first—that ride home,

On March 29, 1948, Shimkin wrote a ten-page memorandum to his boss setting forth the latest developments:
    "After several alternate proposals and a come-down from a demand of .005 per record for a five year period, Mendi Brown is agreeable to taking .0025 per record sold for three years, and giving us the option at the end of the three year term to
    "1. Buy him out with the difference between his collected royalties and $250,000.
    "2. Continue paying him .0025 per record made in the 3 year period.
    "In return for this he turns over his contracts and all interest in the manufacture of the records, and gives us his services as director for any and all services connected with our recordings exclusively. This makes it a pretty good deal for Mendi Brown—and considering our costs working without him as go-between, a pretty good deal for us.
    "I suggest we offer him a lesser settlement after three years in lieu of a guarentee sum each year for the three year period. He would certainly not be getting as good a contract that way—but might very well take—let us say $10,000 a year for three years minimum guarentee against .0025 royalty—and settle for less at our option.

I immediately went back and told my superior about it. We discussed it and I immediately questioned Massler as to whether he would do business with us directly. He said he would be glad to because maybe if he did he would get paid. And he pointed out that his costs were running far in excess of anything that Mendi had reported to us, that he couldn't make a record for 4.85 cents, that he couldn't make the mold for $4,000, that he had to put another some odd—six hundred or eight hundred dollars into it to improve it.
    "But he did state that he would be willing to come in and talk at a meeting about it. We held such a meeting * * *." (Transcript, p. 898.)

"To make clear the object of this reversal of action—its necessary to go over the whole cost picture as compared with the previous cost set-up (buying the records from him. For that reason I've outlined the picture as best I can over the next few pages. These figures are based on direct talks with the parties concerned.

"How it started:

"I found by ordinary investigation—that Mendi's prices to us were rather generous—based on actual costs. This came about when we were asked to put up money for additional molds * * * and I wrote you about that. It all began to pile up. Mendi wanted us to cover any payments to Petrillo, Mendi wanted us to pay for additional molds. Mendi wanted us to pay for any and all re-recording work and extra studio time, Mendi wanted us to pay for anything over .002 that labels cost * * * etc.

"So it came about that upon re-examining our costs—it added up to a heck of a lot more than .065 per record. IE:

"Record—.065

"Union—.0025

"Mold—amortize $20,000 for three molds—over this years production.

"Studio extras—$2,000 for extra sides, Several hundred for re-record.

"TOTAL—appeared to be very near—.08 for the record at least for the next few years. Any savings after that Mendi insisted would have to go to him for some time to recompense him for lack of profit at the beginning. This profit I found had to consist of at least $500 per week or Mendi would be unhappy.

"I also found that Mendi, paying as he was for stampers—was most anxious to get as many records as he could from them * * * to the damage of quality. This was something we couldn't control any other way than by rejecting them after delivery * * * and this would soon put him in the red * * *

and consequently ourselves in the position of having to pay more per record.

"To top it all off—came the mold differential in his asking figures and the actual costs. Bestway (the plant) suggested we deal directly with us. Bart Laboratories, (the stamper people) asked us to back Mendi's credit * * * etc.

"In conclusion—it seems wiser all around to be able to control our production directly—and have assurances of better quality and accurate estimates of delivery.

"At first Mendi refused to admit * * * that he didn't own the process, the machinery etc. for making the records. Then, faced with the obvious facts—based on my meeting the people out at the plant and learning that the plant was owned by the Watson Stillman Company, Mendi refused to allow us to do business directly in terms of stampers, molds etc. By Leon's suggestion that we would cease doing business with him at all—and by that alone, I think he came around to agreeing that it was probably better this way. * * *

"I've outlined briefly the various items that come into the picture if we deal directly. All these figures— the minimums as well as the maximums are generous to a fault * * * however—even if we work on the premise of the maximum figures—we still come out ahead by paying Mendi .0025 per record—

\*   \*   \*   \*   \*   \*

"Production—to date and for 1948

| Title | Opening Inventory March 27 |
|---|---|
| 1. | 2,000 |
| 2. | 9,000 |
| 3. | ..... hundred plus |
| 4. | 5,500 |
| 5. | 7,500 |
| 6. | 9,000 |
| 7. | ..... hundred plus |
| 8. | ..... hundred plus |
| 9. | 5,000 |
| 10. | ..... |
| 11. | 2,500 |
| 12. | ..... |
| Total.... | 41,000....checked and ready for shipment |

"Insufficient stampers—plus the ordinary delays of having only one mold in operation slowed things down in the past week—so that production is at a practical standstill. There are no pressures on Bestway for they are awaiting the outcome of our talks. But—actual fact is that careful supervision and prompting will be necessary until their production is smooth and we can set up a proper checking and delivery system—together with written orders to them.

"If we order 2 molds within the next weeks or so * * * and allow the probable 8 week to 12 week delay for production of them—we have this production to look forward to

"Bestway wants to make the 600,-000 before making any real price and delivery committments to us. If we order two molds this can be expected at the very latest—by August 1.—At that time production will have been proceeding at 100,000 to 120,000 per week since Mold delivery in June.

"Allowing for holdidays—and the following rejection nd perfect record rate which Bestway will probably want—we can expect a minimum of 2,400,000 by the end of the year.

"Bestway * * * wants a medium standard set up * * * in so far as rejects are concerned. They will only guarentee—60% absolute perfection. For our purposes * * * absolute perfection * * * does not mean acceptable records. If 60% are perfect—the likely acceptable figure will be close to 90%—and this will be worked out to both our and Bestway's satisfaction."

The memorandum also contains various computations showing the proposed readjustment of the financial arrangement, including a comparison of costs with and without Gimmicks. Simon and Schuster having decided it was essential to do business directly with Bestway, near the end of March a meeting was held; the participants were Simon and Schuster's executives, Brown, Massler, and Wilson; they agreed to work out a new relationship to the satisfaction of all the parties. The purpose of the discussions relating to the proposed new arrangement was to enable Simon and Schuster economically to market the records.

On April 5, 1948, Shimkin wrote to Massler. The contents of the letter indicate that now Simon and Schuster was dealing directly with Massler. In that letter Shimkin enclosed a check for $6,-500.00 as partial payment for two molds for the production of 6-inch records. "* * * in the very near future we shall be arranging a fuller purchase order and contract * * *." That contract between Simon and Schuster and Bestway was executed on May 20, 1948. One day earlier, however, Simon and Schuster and Gimmicks, Inc., (Brown) also contracted. In the contract is a recital that Simon and Schuster proposes to deal directly with the manufacturer; Brown agrees to transfer to Simon and Schuster all equipment and material involved in the Brown-Simon and Schuster project; Brown and Simon and Schuster rescind their October 21, 1947, contract; Brown acknowledges receipt of $10,993.08 in full payment of all expenses incurred during the project; Simon and Schuster agrees to pay certain unpaid bills incurred by Brown; Brown conveys to Simon and Schuster a mold then possessed by Bestway and all other equipment used in the project; Brown also conveys his interest in several contracts with recording artists and musicians. Finally, Simon and Schuster agrees to pay Gimmicks royalties based on record sales, plus $1,500 upon the signing of the contract.[15]

15. The contract also contains the following statements: " * * * you do not know whether the process now used in the manufacture of Golden Records is or is not the exclusive property of any person. We understand that Louis Spei-

Plaintiffs contend that "* * * while plaintiffs and defendants were engaged in a joint enterprise under a relationship of trust and confidence, in which a secret process had been developed, defendants preempted and fraudulently appropriated unto themselves profits in a business transaction arising out of such joint enterprise."[16]

This court's jurisdiction is based upon the diversity of citizenship of the parties. Thus, the governing law is that which a New Jersey state court would apply to the facts. The facts having occurred, however, in both New Jersey and New York, this federal court also must apply the New Jersey state courts' conflict of laws rule. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. There is no New Jersey case relating to the proper governing law in a so-called joint venture case. The governing law problem in this case is unusually difficult in that plaintiffs do not rely upon a written document, a specific oral understanding, or even a specific transaction as the basis of their claim that a joint venture existed. As this court views the basis of their claim, it is that based on the nature of the parties' conduct the court must conclude that the relationship of plaintiffs and defendants was that of joint venturers whose legal duties to one another have been wrongfully violated by defendants.[17] Is such a claim properly classified as "tort," "contract," or perhaps another traditional classification?

Whatever is the proper label, plaintiffs have chosen to base their rights upon the theory of a joint venture. Accordingly, the decisive legal issue is whether under the facts plaintiffs and defendants were joint venturers. It is not necessary to decide whether a New Jersey state court would apply New Jersey law or New York law.[18] As for the governing law concerning the nature, creation, and existence of a joint venture, happily this court is in the position of the court in Franke v. Wiltschek, 2 Cir., 1953, 209 F.2d 493, where, to paraphrase, the court did not have to attempt to answer the troublesome question whether a New Jersey court would look to the law of New York where the alleged joint venture arose, or the law of New Jersey where the alleged wrongful conduct occurred,[19] for the case law in both jurisdictions is in accord. In New York, "A joint venture has been defined as 'a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation" * * *.'" W. C. Reid & Co., Inc., v. Project Fabrication Corp., Sup., 141 N.Y.S.2d 878, 879, quoting from Forman v. Lumm, 214 App.Div. 579, 212 N.Y.S. 487; profit sharing is a "basal" ingredient of a joint venture. Mariani v. Summers, Sup., 52 N.Y.S.2d 750, 754, affirmed 269 App.Div. 840, 56 N.Y.S.2d 537. In New Jersey, a joint venture "* * * is an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to

gel, Esq., attorney for Bestway Products, Inc., in a letter to Frank Stapleton, Esq., dated November 5, 1947, copy of which is attached hereto, makes certain claims with respect to such process, and that Irving Kahn and Peter Levathes may assert comparable claims, but you make no representation or warranties with respect to such claims. Except as specifically stated herein, you have no knowledge or information regarding any exclusive rights in this process."

16. Plaintiffs' Brief, p. 38.

17. Plaintiffs' first sentence of their trial memorandum is: "The gravamen of the complaint herein is that defendants have

wrongfully and fraudulently appropriated the fruits of a joint venture entered into with plaintiffs." As proof of their complaint, plaintiffs seem to rely on "* * the general principle that a joint venture need not have particular form or formality of expression and that it may even be implied from the conduct of the parties." Plaintiffs' Brief, p. 46.

18. All of the facts occurred in those two states.

19. The alleged fraudulent appropriation of the alleged joint venture's profits occurred in New Jersey where defendants manufactured on their own behalf.

share profits and losses. * * * The term 'Joint Adventure' is defined in 33 C.J. 841, as follows: 'A special combination of two or more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.' A joint adventure necessarily carries the connotation that there is to be a division of the resulting profits between the parties to it. * * *" Kurth v. Maier, 133 N.J.Eq. 388, 391, 31 A.2d 835, 836 (E. & A.1943).

Applying the foregoing principles, have plaintiffs proved a joint venture consisting of at least themselves and Massler?[20]

Prior to April 9, 1947, there was no joint venture, for plaintiffs' conduct during that period evidences their attempts to create a legal relationship with Massler. Plaintiffs admittedly were concerned about his relationship to the group so they decided to attempt to bind him as an employee under an employment contract. Under the cases cited, there is no joint venture unless there is to be a division of profits. Here, there being no proof of such an arrangement during the early activity of the group, there was no joint venture at that time.

As for the period from April 9, 1947, (when Miniature was incorporated) until August 22, 1947, (when Massler surrendered for cancellation his Miniature stock) plaintiffs' and Massler's relationship was that of co-directors, co-officers, and co-stockholders in a corporation. At that time, if there had been any profits resulting from their efforts, any money distribution would have been based upon the respective equity interest of each corporate shareholder. And Massler's manufacturer's profit, which will be discussed, is not the profit sharing feature of a joint venture. Moreover, under the cases cited, it is clear that if the parties are operating as a corporate entity they are not also joint venturers.

Finally, there is no evidence that Massler became a joint venturer with plaintiffs at any time after he surrendered his stock. On August 19, 1947 (three days before Massler's stock surrender), plaintiffs entered into the contract with Brown and Weiss. Although Massler was not a party to that contract, he orally agreed with plaintiffs to manufacture the records for which he was to receive a reasonable manufacturer's profit based upon a " * * * mark up or whatever the custom is in marking up a selling price against a cost of a product."[21] But Massler's status as the manufacturer never ascended to the lofty heights of joint venturer for there is no evidence that he and plaintiffs agreed to or did share profits. The only evidence of any financial arrangement between plaintiffs and defendants is inconsistent with profit sharing. For they never agreed to a price at which Massler would manufacture, except that his price would be consistent with good business principles and a fair profit *to him*. But that is not an arrangement whereby the manufacturer is paid on the basis of a percentage of profit earned by the joint venture, in which case it might be argued that the manufacturer is sharing profits and thereby is a joint venturer. Here, a reasonable inference from the evidence is that Massler would have been paid on the basis of a fair profit *to him*, based upon his costs. There is no evidence that he was to share any of the group's profits. Moreover, plaintiffs were to receive from their licensee 50% of the net income from the latter's sales; if plaintiffs and defendants had intended to share profits, there would have been evidence that they were to share in the royalty amounts. Additionally, in the contract, the licensor acknowledged re-

---

**20.** If the evidence concerning Massler, the person whose conduct plaintiffs assert created the joint venture consisting of at least themselves and all of the defendants, does not create a joint venture, then there is no other evidence tying in the other three defendants as participants.

**21.** Levathes' cross-examination. Transcript, p. 433.

ceipt of $10,000 paid by the licensee. Again there is no evidence that plaintiffs and defendants agreed to share or did share any part of that $10,000.

■ Based on the foregoing, the court concludes that plaintiffs and defendants never were joint venturers. It follows that plaintiffs have shown no right to relief based upon their claim of the existence of a joint venture. Thus, plaintiffs' six demands set forth in their complaint and listed supra, 140 F.Supp. 631, must be denied, for they are based upon the claim that they have a property interest in the process of manufacturing miniature records by the injection molding process which was developed by Massler and Wilson.

"All pleadings shall be so construed as to do substantial justice." Rule 8(f). Pursuant to such a mandate, the court construes the complaint to contain two additional claims: (1) Defendants breached their oral contract with plaintiffs to manufacture for their licensee Brown; (2) defendants induced Brown to breach his contract with plaintiffs.

■ As for the claim relating to the oral contract, unfortunately plaintiffs' brief does not discuss the many legal issues involved. The fact that Massler orally promised plaintiffs that he would continue as the manufacturer for plaintiffs' licensee does not prove that there was a contract between plaintiffs and Massler. There is no evidence of the terms of the alleged contract. Moreover, the oral promise is within the statute of frauds in that plaintiffs contend the consideration to Massler was their promise that he would be the manufacturer under the ten-year license contract. But a contract based upon such mutual promises is "An agreement that is not to be performed within one year from the making thereof." N.J.S.A. 25:1–5. The statute provides that no action shall be brought upon any such agreement unless it is in writing, etc. The New York law is the same. Personal Property Law, § 31, McK.Consol.Laws, c. 41.

Moreover, as defendants have argued " * * * even if there were such an agreement to manufacture, who has asserted here or introduced any evidence that any of the defendants have ever refused to manufacture for either plaintiffs or plaintiffs' licensee? Neither plaintiffs nor their licensee have ever asked defendants to manufacture records for them—plaintiffs since August 19, 1947, and their licensees since March of 1948 * * *." The foregoing discussion of plaintiffs' claim based on an oral contract demonstrates its weakness. Even though Massler did promise to manufacture, plaintiffs apparently do not seriously rely upon a contract claim. For plaintiffs' theory of defendants' liability is expressed both in their trial memorandum and their brief on this motion; it is a theory of joint venture.[22]

■ As for plaintiffs' claim that Massler induced Brown to breach his contract with plaintiffs, the facts have been set forth, supra; clearly, they do not support the claim. Plaintiffs did not call Brown as a witness. But his offer to Simon and Schuster on March 16 or 17, 1948, to "wash his hands of the whole situation" indicates a strained relationship between them. Further indications are that despite Brown's promise to deliver 600,000 records on or before February 1, 1948, he had delivered only sample records and his performance remained unsatisfactory when Simon and Schuster was testing consumer demand late in February and March, 1948. There had been difficult mechanical problems from the time Brown and Massler began their attempts to produce records for delivery under the Simon and Schuster contract. As a result, although Brown had contracted to sell at .065¢ a record, when he began to operate he needed expense money from Simon and Schuster— " * * * it added up to a heck of a lot more than .065 per record", wrote Shimkin in his March 29, 1948, memorandum. Brown, knowing that Simon and Schuster would insist on a new

22. See footnote 17 and the quotation from plaintiffs' brief at 140 F.Supp. 641, supra.

**644**

business arrangement with him, on May 19, 1947 contracted with Simon and Schuster. Even assuming that contract breached his contract with plaintiffs, it resulted not from defendants' inducement but from his inability to perform and Simon and Schuster's desire to profit.

Although the court has liberally construed the complaint, plaintiffs' evidence does not support the two claims.

Defendants' motion is granted.

The foregoing opinion shall constitute findings of fact and conclusions of law, as required by Rule 52.

An order may be submitted in conformity with the opinion herein expressed.