## J. A. DOUGHTY

v.

## FIRST PENNSYLVANIA BANK N. A.

### Civ. A. No. 77–1971.

United States District Court,
E. D. Pennsylvania.

Oct. 18, 1978.

Charles J. Geffen, Philadelphia, Pa., for plaintiff.

J. Dennis Faucher, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

Plaintiff instituted this action claiming that Defendant maliciously and intentionally interfered with and induced the breach of his employment contract with AII Systems, and was therefore liable for the injuries he suffered as a result of the breach of contract. The case was tried to the Court, and after due consideration and pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of facts and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff, J. A. Doughty, is a citizen of the state of New Jersey.

2. Defendant, First Pennsylvania Bank N.A., is a national banking association with its principal place of business in Pennsylvania, within the Eastern District of Pennsylvania.

3. The amount in controversy exceeds $10,000 exclusive of interests and costs.

4. In 1969, Plaintiff and four other individuals started a New Jersey corporation known as Applied Information Industries (Applied). Applied specialized in the design and manufacture of electronic equipment. Plaintiff invested $15,000 in the corporation and held 20% of its stock.

5. At Applied's inception, Plaintiff was Named Vice President of Management Systems. In June 1970, he became Vice President of Finance.

6. In 1972, Plaintiff commenced negotiations with Defendant for a corporate loan which was sought to allow for the development and manufacture of a certain data entry terminal. Plaintiff conducted the major portion of the negotiations with Defendant, through the person of Joseph L. Carboni, an employee of Defendant. On June 16, 1972, Applied and Defendant entered into a Revolving Credit Agreement. Under the agreement, Defendant was to advance funds to Applied and it was to become the secured creditor of Applied's assets.

7. Pursuant to the provisions of the Revolving Credit Agreement with Defendant, Applied entered a written employment contract with Plaintiff on September 8, 1972. P–4. The agreement contained the following provision:

"It is further understood that the Company intends to provide continuing employment to Mr. Doughty through the periods indicated and will use its best efforts to so provide, but continuous employment is not hereinunder guaranteed."

8. Soon after the execution of the Revolving Credit Agreement it became clear to Defendant and Applied that the investment in the data entry terminal was a financial disaster. Applied manufactured hundreds of terminals without a commitment by a purchaser, and no order for them was forthcoming.

9. In light of Applied's financial loss, Defendant had two choices: liquidate Ap-

plied or aid its survival. Defendant opted for the latter, and continued to advance funds to Applied allowing for its continued operation. At that time, Plaintiff and Carboni maintained constant, almost daily, contact about Applied's affairs.

10. In April 1973, Applied split into two different companies, each assuming approximately one half of the debt owed to Defendant by Applied. Plaintiff stayed in the employ of the original company, which now took the name of AII Systems, Inc. (AII).

11. The financial picture of AII remained gloomy and by July, 1974, both AII and Defendant actively sought to locate a corporation that would either merge with or purchase the assets of AII. Barnla, Hines and Westwood, the company's top officers with the exception of Plaintiff, devoted the majority of their time to this project.

12. To make AII financially more attractive to potential acquirers, Defendant converted $1.4 million of AII's outstanding debt to equity in July, 1974. At that point it became the holder of eighty (80%) percent of AII stock. Soon thereafter, a stock bonus plan was instituted whereby employees received stock at periodic intervals; assuming full realization of the plan, the Bank's equity was scheduled to be reduced to sixty percent (60%) of AII stock.

13. In either August or September of 1974, Carboni delivered a letter to Mr. Barnla, President and Chairman of the Board of AII, expressing dissatisfaction with the company's progress, its failure to obtain business, and with the inability of Barnla, Westwood and Hines to secure an acquirer or merger partner of AII. As a result, Barnla, Westwood and Hines resigned as officers. Plaintiff and AII's new president—H. K. Sauer—negotiated settlements of the employment contracts of Barnla, Westwood and Hines; when Barnla could not reach an agreement with Sauer, he continued his negotiations with Carboni and they further negotiated an outstanding loan that Barnla had with Defendant. The

settlement Carboni reached with Barnla was approved by AII's new president, and the settlement that AII reached with the other two officers was submitted to Carboni. Carboni approved these settlements, although it would appear that his approval was not required.

14. Upon Barnla's resignation, the AII Board of Directors elected H. K. Sauer as the president and chief executive officer in December 1974. Sauer was originally hired by AII in the spring of 1973 as Director of Commercial Products. Although he tendered his resignation from AII in September 1974, it never became effective because he thereafter was promoted to the presidency. After meeting with Carboni and another bank employee, he had been asked by Carboni whether he would be interested in running AII if it could be arranged. As Sauer, responded positively, before his resignation became effective, Defendant requested that he be elected President. The Board of Directors satisfied the request.

15. Before assuming the presidency of AII, Sauer learned from the Company's previous officers that Plaintiff was "persona non grata" within AII. Nonetheless, upon becoming president, Sauer kept Plaintiff as an employee to decide for himself about Plaintiff's capabilities.

16. During his tenure, Sauer formed a negative opinion of Plaintiff. He came to believe that Plaintiff was unable to perform the various responsibilities with which he was entrusted. Sauer thought that he gave Plaintiff an opportunity to prove himself in the marketing, financial and manufacturing areas, and that Plaintiff failed to do so. The Court arrives at this finding as to Sauer's state of mind based upon the Sauer's testimony. Although the testimony of a witness as to his own state of mind is not conclusive and can be rebutted by circumstantial evidence, convincing circumstantial evidence indicating otherwise was not produced in this case. For example, there was no testimony by employees of AII as to Plaintiff's capabilities which would

allow the Court to conclude that Plaintiff was so highly qualified that it would be impossible to believe that Sauer actually thought Plaintiff incompetent. Nor was there testimony that Sauer spoke highly of Plaintiff or thrusted important responsibilities upon him. Rather, the only commendation of Plaintiff's performance during the time Sauer was president came from Plaintiff himself; this evidence does not cause the Court to disbelieve Sauer's characterization of his own state of mind.

17. In January 1975, Carboni was promoted within Defendant, and Edward F. Sager was assigned the daily task of monitoring the AII account. Unlike his predecessor, he preferred to receive the reports on AII's activities from the AII president, rather than from Plaintiff.

18. As AII's economic position worsened, Defendant and AII continued to explore acquisition possibilities. In the spring of 1975, AII and Defendant discussed such a proposal with California Microwave. One of California Microwave's negotiating conditions was absolute confidentiality with regard to the negotiations. Sauer so informed his staff. Nevertheless, Plaintiff told a representative of one of AII's institutional investors about the negotiations. Notwithstanding any justification for this disclosure, it is clear that Plaintiff's conduct angered Sager when he learned about it. Sager had Plaintiff's employment contract reviewed and advised Sauer that it was a best efforts contract and was not legally binding. In early July 1975, he asked Sauer to fire Plaintiff.

19. Sauer refused, and responded by telling Sager that he, as president, was running the company. Sauer then discussed the matter with Plaintiff and told him to take the following week off. Plaintiff did so and returned to work after a week.

20. Although the financial condition of AII was weak in January 1975, AII had sixty-five to seventy employees. However, it became clear that in order for the company to survive until an acquirer was found, if one were ever found, employees would have to be laid off. The company could not afford to retain all its employees and, at the same time, maintain operation.

21. In August of 1975, Sauer decided that it was necessary to furlough all employees who were not involved in marketing and delivering the company's product to the consumer. After reviewing the personnel roster with his staff, Sauer decided to furlough twenty-four or twenty-five persons. This was not the first time AII furloughed employees; in 1974, fifteen to eighteen employees had been laid off at Plaintiff's suggestion. And in fact, in June of 1975, Plaintiff had recommended laying off additional employees. When AII distributed furlough notices on August 11, 1975, Plaintiff received one along with all the other members of his department. Plaintiff was the only management level employee to be furloughed.

22. Sauer based his decision to furlough Plaintiff on his evaluation of Plaintiff's usefulness to AII at that time; he concluded that Plaintiff was not contributing to AII's business and that AII could not afford to retain him. The actions of Defendant, by and through its employees, were not the proximate cause of Plaintiff's furlough.

23. Plaintiff would have been furloughed regardless of Sager's request and Plaintiff's disclosure of information to the representative of the institutional investor did not contribute to his being on the furlough list. The decision to furlough Plaintiff was based upon Sauer's independent evaluation of Plaintiff's performance and AII's needs at that time. Although the proximity in time between Sager's request that Plaintiff be fired and Plaintiff's furlough tends to support a finding that Sager's action proximately caused the lay off, this evidence is insufficient to discredit Sauer's testimony as to his own state of mind, especially since the furlough was consistent with the action taken against many of AII's employees at that time.

24. The furloughs were extended and notice of the extensions given on September 18, October 30, and December 15.

25. None of the employees furloughed ever returned to the payroll, although Sauer intended that they be rehired if a merger or acquisition occurred.

26. In October 1975, Plaintiff filed suit in New Jersey against AII alleging breach of his employment contract. Because of that suit's institution, Sauer requested Plaintiff's resignation and when he refused, he was notified that his services were terminated.

27. The financial condition of AII worsened and Defendant made demand for repayment of its loans; AII was caused to terminate operations. Defendant liquidated the assets of the company pursuant to its rights under the loan agreement.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332.

2. To prove his claim against Defendant for malicious interference with his employment contract, Plaintiff must establish that, but for the conduct of Defendant, Plaintiff would have had the benefit of his bargain under the contract; in other words, Plaintiff must establish that Defendant's conduct was the proximate cause of the breach of the agreement. *Kurtz v. Oremland*, 33 N.J.Super. 443, 111 A.2d 100 (1954); *Kahn v. Massler*, 140 F.Supp. 629 (D.N.J. 1956), *aff'd* 241 F.2d 47 (3d Cir. 1957).

3. Plaintiff has not shown by a preponderance of the evidence that Defendant's conduct was the proximate cause of the employment furlough or termination, and Defendant is therefore not liable to the Plaintiff. The Court makes no finding with respect to whether the employment contract was breached, as it is not necessary to decide that issue to resolve this matter.

4. Judgment will be entered in favor of Defendant.